Filed 10/2/20  In re Ivy W. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re IVY W., a Person Coming Under the Juvenile Court Law. | B304872 (Los Angeles County  Super. Ct. No. 19CCJP06727) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICKY B.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Ricky B. (Father) appeals from the disposition order, challenging the sufficiency of the evidence supporting the jurisdictional findings against him and the removal of his infant daughter from his custody. He also contends the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with duties under the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.) For the reasons explained below, we reject Father's contentions and affirm the order.

## BACKGROUND

### I.   The Family

At the time Father and Ryan W.'s (Mother)[2] newborn, Ivy W., was detained from them in October 2019, Father and Mother had been in a relationship on and off for around eight or nine years. During the tenure of their relationship, a juvenile court terminated Mother's parental rights to two children from a previous relationship (Ivy's half siblings) due to Mother's history of phencyclidine (PCP) use, which dated back to at least 2012. In one of these two prior dependency cases, the juvenile court sustained an allegation under section 300, subdivisions (a) and (b) that in February 2014, Father repeatedly struck Mother in the face, inflicting bruising and swelling to her eye, while she was

_____

[1] Further statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

2

holding one of her children from a previous relationship. Father was not a party to these prior dependency cases, as the children involved were not his children.

Prior to Ivy's birth in October 2019, Father and Mother had two other children together, in 2015 and 2017. Father did not sign the children's birth certificates or claim them as his own when they were born. Accordingly, when these two children became dependents of the juvenile court due to Mother's substance abuse, Father was not involved in their dependency proceedings. Mother's parental rights to the older of these two children with Father were terminated in 2017. It is not clear from the record if her parental rights to the younger of these two children had been terminated at the time dependency proceedings in this case involving Ivy commenced.

After Mother became pregnant with Ivy, Father accompanied Mother to her prenatal doctor appointments. At one of the appointments at which Father was present, in June 2019, Mother tested positive for PCP and methamphetamine. Father was present at the hospital when Ivy was born, and he signed the birth certificate.

## II. Detention

In October 2019, DCFS received a referral from the hospital stating that at the time of Ivy's birth Mother tested positive for PCP. Around 16 hours after Mother's positive test, the hospital tested Ivy, and the newborn tested negative for all substances.

The day after Ivy's birth, a DCFS social worker interviewed Father at the hospital. Father stated he and Mother had been in a relationship on and off for around eight or nine years but were no longer in a relationship at the time of Ivy's birth. He denied

3

he and Mother lived together and represented he and Mother did not communicate other than the occasions when he took her to her prenatal doctor appointments. He denied knowing about Mother's substance use prior to the June 2019 doctor appointment at which she tested positive for PCP and methamphetamine. He asserted Mother had been "clean" since that positive test. When the social worker asked if he had talked to Mother about her substance use, he responded, " 'We don't discuss those things.' " He denied he had seen Mother use drugs. He stated he believed she "is a good mother and should be given a chance." But he also stated he was "aware that she would not be able to see the child [Ivy]," and he "would have no problem protecting the child from [M]other."

Father disclosed to the social worker that he previously used PCP and marijuana but stopped using around 2007 or 2008.[3] He "denied any mental health diagnosis." He acknowledged domestic violence allegations had been made against him in the past but claimed the allegations "were dismissed in court." He admitted he had a criminal history as a juvenile and an adult. He told the social worker that as an adult, he had been arrested for criminal threats and a probation violation. When the social worker asked why he was on probation, he said he could not remember. As set forth in DCFS's October 17, 2019 Detention Report, between 2005 and 2006, when Father was an adult, he sustained felony convictions for carrying a loaded firearm, possession of a firearm by a felon, and transportation or sale of narcotics or controlled substances (in

_____

[3] Three days after this interview, on October 15, 2019, Father submitted to a drug test and the results were negative.

4

addition to other misdemeanor convictions). In 2016, Father was convicted of corporal injury upon Mother.[4]

Father informed the social worker that Ivy was his third child with Mother. He explained he "was not around [M]other" when their first child was born, and he was in jail when their second child was born, so he did not sign either of their birth certificates. He stated he also had a 12-year-old child from another relationship who lived with the child's mother, and he shared joint legal custody of the child.

When the social worker interviewed Mother the same day, Mother denied having a history of substance abuse or any relationships involving domestic violence. Mother told the social worker that she lived with Ivy's paternal great-grandmother (Father's grandmother). When the social worker interviewed Father's roommate the next day, the roommate stated that Mother had lived in her home for "a while," leading up to Ivy's birth. The roommate also stated that Father had been living with her (the roommate) for the past year.

On October 13, 2019, DCFS obtained a removal order and placed Ivy on a hospital hold. On October 16, 2019, DCFS filed a dependency petition under section 300, subdivision (b), alleging Mother's history of substance abuse (including dependency proceedings involving four other children), and Father's failure to protect Ivy from Mother's substance abuse, placed Ivy at risk of serious physical harm, damage, danger, and failure to protect.

---

[4] According to Father's criminal history transcript attached to the Detention Report, and Father's admissions to a DCFS dependency investigator, Father was placed on probation following the 2016 domestic violence conviction involving Mother. He violated his probation in 2017 and was incarcerated.

Father and Mother appeared at the detention hearing on October 17, 2019. The juvenile court found DCFS made a prima facie showing that Ivy was a person described by section 300. The court detained Ivy from Father and Mother and ordered monitored visitation for the parents. The court restricted Father and Mother from visiting Ivy together.[5] On October 18, 2019, DCFS placed Ivy in the same foster home as a half sibling and a sibling, who were receiving permanent placement services.[6]

On November 25, 2019, DCFS filed an amended petition, which included the allegations from the original petition regarding Mother's history of substance abuse and Father's failure to protect Ivy from Mother's substance abuse (count b-1), and added allegations regarding: (1) Father and Mother's history of domestic violence, including the 2014 and 2016 incidents referenced above (count b-2); (2) Father's history of substance abuse, including a positive toxicology screen for PCP in 2019, on a date not specified (count b-3); (3) Father's history of mental and emotional problems, including schizophrenia, and his failure to take his prescribed psychotropic medications (count b-4); and (4) Mother's history of mental and emotional problems.[7]

---

[5] Notwithstanding the visitation order, on October 25, 2019, Father and Mother appeared together at a DCFS office for a monitored visit with Ivy.

[6] Ivy remained in this home throughout the proceedings at issue in this appeal.

[7] The original and amended petition also included allegations under section 300, subdivision (j), regarding neglect of Ivy's siblings and half siblings. The juvenile court later

6

### III.  Jurisdiction/Disposition

On November 13, 2019, Mother tested positive for PCP, and on November 25, 2019, she failed to show for a scheduled test. Father tested negative for all substances throughout these dependency proceedings.

On November 19, 2019, Father brought Mother to the DCFS office so the dependency investigator could interview them. Mother told the investigator she was unaware of any drug use by Father.  Mother declined to discuss the history of domestic violence incidents between her and Father, stating she was not "a snitch."  She did state, " 'I'm a fighter but I don't want to fight. It's just my mouth.' "  Mother reported she currently lived at the home of Ivy's paternal great-grandmother.

During his interview, Father told the investigator he was aware of Mother's substance abuse history and resulting prior dependency proceedings.  As set forth in DCFS's December 10, 2019 Jurisdiction/Disposition Report, Father explained that when he lived with Mother (at a time not specified), "she would use PCP in the bathroom but he did not let her smoke meth in his home. . . .  [H]e started locking [her] out of the home but she still smoked PCP outside of the house and at the bus stop. . . . [W]hen he realized [she] was pregnant he did not allow her to smoke or use any drugs in the home."  Father asserted he did not know Mother used drugs during her pregnancy with Ivy until her positive test during a June 2019 prenatal appointment.  He said he was unaware of other drug use by Mother during her pregnancy.  According to Father, after Ivy was detained at the hospital, he and Mother were in his car, when he fell asleep and

---

dismissed the subdivision (j) allegations at DCFS's request at the December 10, 2019 adjudication hearing.

awoke to Mother "trying to smoke PCP in his car." Father stated that he pulled Mother out of the car and drove away. He told the investigator that if he had custody of Ivy, he would not leave the newborn alone with Mother, and when Mother "stopped lying, they could talk about her involvement in the child's life."

Regarding domestic violence between him and Mother, Father admitted the 2016 incident for which he was convicted and told the investigator that no child was present during that incident. He stated there were no other incidents of domestic violence between him and Mother. He denied the 2014 incident that was the subject of the sustained allegation in a dependency proceeding to which he was not a party, involving Mother's child from a different relationship. He told the investigator he lived with Mother between 2013 and 2017, until he was incarcerated for a probation violation during his probation on the domestic violence conviction.

At the time of his October 19, 2019 interview with the dependency investigator, Father was on probation in two different cases. He was placed on probation in 2018 for carrying a concealed weapon and in 2019 for terrorist threats and assault with a deadly weapon. He was enrolled in a residential drug treatment program as a condition of probation and provided DCFS with a positive progress letter from the program. As stated in the Jurisdiction/Disposition Report, Father "denied having drug or alcohol abuse history aside from marijuana which [he] reported last smoking in 2001." When the investigator asked if he had any positive drug tests since starting the drug treatment program in January 2019, Father "reported that it was possible that he had some positive tests but it was because he was around people who were smoking and not because he was

actually using drugs himself." Father told the investigator he currently lived "between" the residential treatment program, Ivy's paternal great-grandmother's home, and motels.

During the interview, Father told the investigator about his history of mental health issues and prescriptions for psychotropic medications, dating back to 2011 or 2012. Most recently, in January 2019, he was diagnosed with schizophrenia and prescribed psychotropic medication by a mental health center. He received mental health services at the center until the end of April 2019, when his eligibility for services ended. At the time of his interview, he was no longer taking psychotropic medication and did not want to resume taking such medication.

On November 20, 2019, the dependency investigator interviewed Father's probation officer, to whom he had been assigned since April 2019 and with whom he met monthly. The probation officer reported that she had received some positive drug test results for Father for PCP, acetaminophen, and another drug she could not recall.[8] When the investigator asked about any mental health concerns regarding Father, the probation officer responded: " 'I would have to say my main concern is the drugs. The drugs does [sic] have something to do with the mental health but it's mainly being on and off the drugs with him. I can't tell the difference with him.' " The probation officer was aware Father took medication to treat pain, but she was unaware of him taking psychotropic medication. Father informed the

---

[8] The probation officer did not have the drug test results in front of her during her interview with the dependency investigator, and she did not provide copies of the results to DCFS.

probation officer and the criminal court that he wanted to do an outpatient drug program, instead of the one-year residential treatment program he was ordered to complete, so that he could take care of Ivy.  The probation officer told the investigator "that she was planning to recommend that [Father] complete his current program and continue testing on a regular basis."  She added, " 'I'm not recommending to terminate anything.  He is not stable.  He needs to continue in this program.' "

On November 25, 2019, the dependency investigator interviewed a laboratory technician regarding Father's claim that he may have had positive drug test results from being around others who were smoking drugs.  The technician explained that for that to occur, Father would have to be with people who were smoking drugs for an extended period, meaning an hour to several hours, and Father " 'would probably feel high [him]self.' "

On December 2, 2019, Father went back to the mental health center where he was diagnosed with schizophrenia in January 2019.  The center assessed and evaluated Father and found "he did not meet medical necessity" at that time.  The center provided a letter to this effect, which Father forwarded to DCFS.  DCFS attached the letter, and other of Father's mental health records, to its December 10, 2019 Last Minute Information for the Court.

At the adjudication hearing, held December 10, 2019, the juvenile court admitted into evidence DCFS's reports (described above), the prior sustained dependency petitions involving Ivy's half siblings and siblings, and another positive progress report from Father's residential substance abuse program, dated December 9, 2019, stating:  "[Father] has been progressing very well in treatment and is serious about his sobriety and living his

10

life without any use of drugs.  [Father] attends substance abuse groups 5 days a week.  He also attends Anger Management, Domestic Violence, and Parenting classes.  FFC Substance Abuse Treatment Program is [a] DCFS approved program.  [Father] will be completing his substance abuse program on January 22, 2020.  [Father] has been submitting negative urinalysis test[s] and has been openly sharing in group discussions.  [Father] has put his negative behaviors behind him and he is committed to be a great father to his daughter.  [Father] is very determined to be in his daughter's life and be a father to her.  [Father] is scheduled to see the therapist once a week for an individual [*sic*] and work out any unresolved issues he has."

DCFS's counsel and Ivy's counsel urged the juvenile court to sustain all allegations in the petition.  Mother's counsel asked the court to dismiss the petition as to her on grounds that Mother disputed the accuracy of her positive drug test results and denied the alleged history of domestic violence with Father.  Father's counsel asked the juvenile court to dismiss the petition as to him on the grounds:  (1) the allegations regarding Father's substance abuse, mental and emotional problems, and history of domestic violence with Mother (the 2016 domestic violence conviction) were not based on Father's current circumstances; (2) Father was determined to protect Ivy from Mother's substance abuse; (3) Father did not have an opportunity to challenge the sustained allegations regarding the 2014 incident of domestic violence with Mother in the prior dependency proceedings because he was not a party; (4) Father's probation officer did not provide copies of alleged 2019 positive drug test results to the parties in this case; (5) Father consistently tested negative for drugs during these dependency proceedings; and (6) there was no nexus between

11

Father's mental and emotional problems and a risk of harm to Ivy.

After hearing the parties' arguments, the juvenile court sustained all allegations alleged in the petition: (1) Mother's history of substance abuse and Father's failure to protect Ivy from Mother's substance abuse (b-1); (2) the history of domestic violence between Father and Mother (b-2); (3) Father's history of substance abuse (b-3); (4) Father's mental and emotional problems (b-4); and (5) Mother's mental and emotional problems (b-5). The court commended Father for engaging in programs but found he continued to struggle with the issues alleged in the petition. The court continued the matter for disposition.

In a January 15, 2020 Last Minute Information for the Court, DCFS stated that Father received another positive progress report from his residential drug treatment program, dated January 13, 2020. The progress report noted Father "struggled early on in his recovery process but quickly understood his need for change and the importance of being a responsible parent and how his sobriety would be able to help him fully provide for his children['s] need[s]." DCFS also informed the juvenile court that Father was in compliance with the terms of his probation and, on December 20, 2019, 11 months after Father enrolled in the residential drug treatment program, the criminal court ordered that Father could complete his drug treatment requirement on an outpatient basis. DCFS also stated that Father was consistently visiting Ivy and there were no concerns regarding his visits. DCFS further stated in a Multidisciplinary Assessment Team Summary of Findings Report, attached to the Last Minute Information for the Court, that during a December

12

13, 2019 interview for a Multidisciplinary Assessment Team meeting, Father stated he had been sober for 10 months.

At a hearing on January 22, 2020, Father's counsel provided the juvenile court and the parties with various exhibits, including: (1) the January 13, 2020 progress report from Father's residential drug treatment program, described above; (2) a January 21, 2020 certificate of completion of the one-year drug program; (3) a January 21 certificate of completion of parenting, anger management, and domestic violence classes; and (4) additional negative drug test results.

In a February 6, 2020, Last Minute Information for the Court, DCFS stated that Father's therapist reported he had participated in six therapy sessions. At the February 6, 2020 disposition hearing, the juvenile court admitted into evidence a letter from the therapist stating the same, a letter from Father's outpatient substance abuse aftercare program stating he was attending two group sessions and an individual therapy session per week, DCFS's reports (described above), and the prior sustained dependency petitions involving Ivy's half siblings and siblings.

DCFS's counsel argued at the disposition hearing that although DCFS was recommending unmonitored visitation for Father given his progress in his programs, DCFS was not prepared to recommend that Ivy be returned to Father given his history of substance abuse, mental and emotional problems, and domestic violence with Mother. DCFS recommended the juvenile court grant Father reunification services and deny Mother reunification services. Ivy's counsel joined in DCFS's recommendations. Father's counsel argued DCFS's recommendation for Ivy's removal from his custody was not

supported by clear and convincing evidence.  Mother's counsel requested reunification services for Mother.

The juvenile court declared Ivy a dependent of the court and removed her from Father and Mother, stating clear and convincing evidence supported the removal order.  The court granted reunification services for Father and denied them for Mother.  The court ordered Father to complete a case plan consisting of a drug and alcohol program, random or on demand drug and alcohol testing, a parenting program, and individual counseling to address domestic violence, substance abuse, and relapse, with Father to be given credit for programs he had already completed.  The court granted Father unmonitored visitation in a neutral, public setting, with advance notice to DCFS of the location, and without Mother being present.  The court granted monitored visitation for Mother.

## DISCUSSION

Father challenges the sufficiency of the evidence supporting the jurisdictional findings against him and the removal of Ivy from his custody.  He also contends DCFS failed to comply with duties under ICWA.

## I.     Jurisdictional Findings Against Father

### A.     Justiciability of Father's contention

As Father acknowledges, the juvenile court's jurisdiction over Ivy will continue, whether or not this court reverses the jurisdictional findings against him, based on the jurisdictional findings against Mother, which are unchallenged on appeal. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory

14

bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) "Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only. In those situations an appellate court need not consider jurisdictional findings based on the other parent's conduct." (*In re J.C.* (2014) 233 Cal.App.4th 1, 3.)

In his opening appellate brief, Father asks this court to exercise its discretion to review the merits of his challenge to the jurisdictional findings against him, arguing these findings are the basis for the removal order and case plan against him, and they may prejudice him in future dependency proceedings. We may "exercise our discretion to reach the merits of the other parent's jurisdictional challenge in three situations: (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re J.C.*, *supra*, 233 Cal.App.4th at p. 4.) Because the jurisdictional findings against Father are the basis for the portion of the disposition order removing Ivy from his custody, and Father challenges the removal on appeal, we review whether the juvenile court properly made jurisdictional findings against Father.

**B.     Standard of review**

"In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence,

15

contradicted or uncontradicted, to support the finding.  In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences.  Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

### C.    Legal standards for jurisdiction under section 300, subdivision (b) and analysis

Jurisdiction under section 300, subdivision (b), requires proof "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ."  (§ 300, subd. (b).)  In deciding whether there is a substantial risk of serious physical harm or illness, within the meaning of section 300, subdivision (b), courts evaluate the risk that is present at the time of the adjudication hearing.  "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, abrogated in part on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 627-629.)  "The juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm . . . ." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.)  "To establish a defined risk of harm at the time of the hearing, there 'must be

16

some reason beyond mere speculation to believe the alleged conduct will recur.' " (*Ibid*.)

We begin our review with jurisdictional finding b-3, which states: "[Father] has a history of substance abuse, including PCP, which renders the father incapable of providing regular care of the child. In 2019, the father had a positive toxicology screen for PCP. Such substance abuse by the father endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage and danger." Father argues this finding is not supported by substantial evidence because: (1) "[t]here were no positive drug test results for [Father] during this case"; (2) DCFS "never produced a positive test but merely relayed information that [Father] tested positive in 2019 without showing any proof"; (3) the evidence in the record demonstrated Father did not have a current substance abuse issue; and (4) "[h]earsay evidence was not sufficient evidence to support a true finding [on] this allegation." For the reasons discussed below, we reject Father's challenge to the sufficiency of the evidence supporting this finding.

Substantial evidence in the record demonstrates Father had a long-standing issue with drugs. He admitted to PCP use that occurred more than a decade before Ivy was detained. He had convictions in 2005 and 2006 for transportation or sale of narcotics or controlled substances. Father's residential treatment program reported to DCFS that Father struggled with his sobriety after he enrolled in the program in January 2019. Father's probation officer reported to DCFS that Father had positive test results for PCP in 2019. In November 2019, Father's probation officer, who had met with him monthly since April 2019, reported to DCFS that she did not believe Father's on-

17

again, off-again issue with drug use had stabilized. During a December 2019 interview in connection with a Multidisciplinary Team Meeting, Father stated he had only been sober for 10 months, despite his prior denials of any substance use (including alcohol) in the last decade.

We reject Father's argument, raised for the first time in his reply brief, that hearsay evidence—specifically the probation officer's statement about positive drug test results in 2019—"was not sufficient evidence to support a true finding [on] this allegation." Under section 355, subdivision (b), "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)." Subdivision (c) provides, in pertinent part: "If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes [certain enumerated] exceptions." (§ 355, subd. (c)(1).) Subdivision (d) of section 355 allows a party "to subpoena a witness whose statement is contained in the social study or to introduce admissible evidence relevant to the weight of the hearsay evidence or the credibility of the hearsay declarant." Father did not raise a hearsay objection below and, in any event, DCFS did not rely *only* on the probation officer's statement about the positive drug tests in proving allegation b-3. Accordingly, Father's argument is without merit.

18

We acknowledge that during the four months between detention and adjudication, Father tested negative for drugs. For two of those months he was enrolled in a residential treatment program. He was newly enrolled in an outpatient program at the time of the adjudication hearing—a big change and a test for his sobriety.

Father continued to place himself in situations that were risky for relapse, given his long-standing struggles with maintaining sobriety. He associated with Mother—e.g., taking her to a meeting at the DCFS office and a visit with Ivy—even though Mother continued to use PCP during these dependency proceedings. He spent time with people who smoked drugs in his presence. He told the investigator that he may have had positive drug test results after he enrolled in the residential treatment program in January 2019 because he was around others who were smoking drugs.

Ivy was an infant, not quite four months old at the time of the adjudication hearing. Where a child is "of 'tender years,' " like Ivy, " 'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in substantial risk of harm.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219.) As summarized above, substantial evidence demonstrates Father had a history of substance abuse, and he was in the process of treating his substance abuse problem at the time of the adjudication hearing. The juvenile court did not err in making jurisdictional finding b-3.

### D.    Other jurisdictional findings against Father

We need not review Father's challenge to the sufficiency of the evidence supporting the other three jurisdictional findings

made against him.  Father challenges on appeal the order removing Ivy from his custody, and there would be no basis for the removal order if there were no basis for a jurisdictional finding against him.  We have concluded substantial evidence supports jurisdictional finding b-3 and as discussed below, substantial evidence regarding Father's history of substance abuse supports the removal order.

We would exercise our discretion to review Father's challenge to the sufficiency of the evidence supporting the other three jurisdictional findings if those findings could be prejudicial to Father in the future or serve as the basis of a dispositional order Father challenges on appeal.  (See *In re J.C.*, *supra*, 233 Cal.App.4th at p. 4.)  The finding regarding Father's failure to protect Ivy from Mother's substance abuse and the finding regarding Father's history of mental and emotional problems will be no more prejudicial to Father in the future than the finding regarding Father's history of substance abuse, which we have already upheld in this appeal.  Regardless of whether we reverse the finding in this case concerning Father's history of domestic violence with Mother, the basis for that finding will live on in the sustained finding in Mother's prior dependency case regarding the 2014 incident of domestic violence between Father and Mother and Father's 2016 conviction for corporal injury upon Mother.

Aside from removal, Father does not challenge any other portion of the disposition order.  For example, he does not challenge the order that he complete a particular program that is based on one of the jurisdictional findings we have not reviewed.  But even if he did, prior to the adjudication hearing, Father had already completed domestic violence and parenting programs (in

20

addition to the substance abuse program), and he received credit in his case plan for the programs he completed.

Father has raised no reason for this court to exercise its discretion to review his challenge to the sufficiency of the evidence supporting the other three jurisdictional findings against him.

## II. Removal of Ivy from Father's Custody

A juvenile court may take a dependent child from the physical custody of her parent where "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's . . . physical custody." (§ 361, subd. (c)(1).)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.] [¶] Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

21

"Whether the conditions in the home present a risk of harm to the child is a factual issue" to which "we apply the substantial evidence test." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 170.) "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. In a matter such as the one before us, when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

The record before us contains substantial evidence from which the juvenile court could have found it highly probable that Ivy's welfare required removal from Father because of Father's history of substance abuse. As discussed above, Father had a long-standing history of substance abuse. At the time of the adjudication hearing, he had been sober for about a year, by his own account. He had spent most of that year in a residential drug treatment program. He left the residential program and began an outpatient drug treatment program only a month and a half before the adjudication hearing. Given Ivy's young age (four months) and need for constant care, Father's history of relapse,

22

and his tendency to associate with people who used drugs, substantial evidence in the record demonstrated a substantial risk of danger to Ivy' physical health if she were placed in Father's custody before he completed drug treatment; and there were no reasonable alternatives other than removal to protect her.

## III. ICWA Inquiry

### A. Proceedings below

As set forth in the Detention Report in this case, in April 2017, in a prior dependency proceeding involving Mother and Ivy's half sibling, the juvenile court found ICWA did not apply.

On an attachment (form ICWA-010(A)) to the original dependency petition in this case, filed on October 16, 2019, DCFS checked a box indicating the "child has no known Indian ancestry," stated "ICWA does not apply," and further indicated that Father and Mother had been interviewed at the hospital on October 12, 2019 regarding whether Ivy may be an Indian child.

In the Detention Report, DCFS stated ICWA does not apply. DCFS further stated that Father denied any Native American ancestry when he was interviewed at the hospital on October 12, 2019. DCFS indicated in the Detention Report that Mother also was interviewed at the hospital regarding whether Ivy may be an Indian child, but DCFS did not state in the report how Mother responded to the inquiry.

At the October 17, 2019 detention hearing, Mother filled out and signed form ICWA-020, "Parental Notification of Indian Status." She checked the box stating, "I may have Indian ancestry," listed the tribe as Cherokee, and wrote maternal great-grandmother, Carolyn B., Taylor G., and Lisa G. Father also filled out form ICWA-020, indicating he did not believe he had

23

any Indian ancestry.  In its minute order from the detention hearing, the juvenile court stated:  "The Court is informed there may be some Cherokee Tribes Native American/Indian heritage in the mother's background.  [DCFS] is ordered to investigate said claim.  The Court does not have a reason to know that ICWA applies as to Father."

On an attachment (form ICWA-010(A)) to the amended dependency petition, filed November 25, 2019, DCFS checked the box indicating it had reason to know Ivy may be an Indian child, based on a November 19, 2019 interview with Mother.  DCFS reported that in the interview Mother stated she "has Cherokee Indian ancestry through her maternal grandmother."

On November 25, 2019, DCFS mailed ICWA notices (form ICWA-030) to three Cherokee tribes, the Bureau of Indian Affairs, and the U.S. Department of the Interior.  On the form notice, DCFS listed contact information for Lisa G., one of the names Mother wrote on form ICWA-020.  In a Last Minute Information for the Court, dated December 20, 2019, DCFS reported it had received return receipts from two of the Cherokee tribes and attached them to the report.

At the adjudication hearing on December 10, 2019, the juvenile court noted Mother stated she had Indian heritage.  The court listed Ivy's maternal great-grandmother and Carolyn B., Taylor G., and Lisa G. as the persons Mother identified.  The court stated:  "So [DCFS] has already followed up on notifying the tribes.  If there's any additional information, [DCFS] to make due diligence to uncover it and provide further information by disposition."

In a Last Minute Information for the Court, dated January 15, 2020, DCFS reported it had received return receipts from the

24

third Cherokee tribe, the Bureau of Indian Affairs, and the U.S. Department of the Interior and attached them to the report.

At the February 6, 2020 disposition hearing, the juvenile court found ICWA "notices went out in a timely fashion; no responses have been provided; 60 days ha[ve] elapsed." On February 7, 2020, the court issued a minute order, stating ICWA notice was proper and ICWA does not apply in this case.

## B. Analysis

Under ICWA and California law, it is clear DCFS did not have a duty to provide notice of the proceedings to the Bureau of Indian Affairs or the Cherokee tribes, based on the information DCFS knew about Mother's potential Cherokee ancestry. Under ICWA, an "Indian child" is an unmarried person under 18 years of age who is (1) a member of a federally recognized Indian tribe or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].) ICWA notice is required if DCFS or the juvenile court knows or has reason to know a child is an Indian child. (25 U.S.C. § 1912(a); § 224, subd. (a); Cal. Rules of Court, rule 5.481(b)(1).) On form ICWA-020 Mother checked the box stating, "I may have Indian ancestry," listed the tribe as Cherokee, and wrote maternal great-grandmother, Carolyn B., Taylor G., and Lisa G. "Indian ancestry, however, is not among the statutory criteria for determining whether there is a reason to know a child is an Indian child." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 887; see § 224.2, subd. (d) [setting forth criteria]; see also *In re A.M.* (2020) 47 Cal.App.5th 303, 321.) Accordingly, the information Mother provided does "not constitute information that a child 'is an Indian child' or

information indicating that the child is an Indian child, as is now required under both California and federal law" to trigger the notice requirement.  (*In re Austin J.*, at p. 887, citing § 224.2, subd. (d)(1) & (3) and 25 C.F.R. § 23.107(c).)

The question at issue on appeal is whether DCFS satisfied the duty of inquiry.  DCFS and the juvenile court "have an affirmative and continuing duty to inquire whether a child" involved in dependency proceedings "is or may be an Indian child."  (§ 224.2, subd. (a).)  When DCFS detains a child and places that child in foster care, its duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  "At the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)) and order the parents to complete form ICWA-020 (Parental Notification of Indian Status).  (Cal. Rules of Court, rule 5.481(a)(2)(C).)  If the juvenile court or social worker "has reason to believe that an Indian child is involved in a proceeding," the court or social worker "shall make further inquiry regarding the possible Indian status of the child," including, but not limited to:  (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying and contacting tribes; and (3) contacting tribes and others "that may reasonably be expected to have

information regarding the child's membership, citizenship status, or eligibility."  (§ 224.2, subd. (e).)

Father claims DCFS had reason to believe Ivy is an Indian child, based on the information Mother provided on form ICWA-020, and "further inquiry regarding possible Indian status of the child was required which included interviewing the parents and extended family members."  Father asserts, "Reversal is warranted for further inquiry, and if legally appropriate, notice to the tribes based on further inquiry."  We disagree.

The mere fact that Mother wrote a list of names on form ICWA-020 does not mean DCFS had a duty to inquire further. Mother did not check the box indicating that any of her relatives were members of a tribe or the box indicating she may be a member of, or eligible for membership in, a tribe.  (See *In re A.M.*, *supra*, 47 Cal.App.5th at pp. 309, 322 [agency had reason to believe child was an Indian child where the mother checked the box on form ICWA-020 "indicating that she was or may be a member of, or eligible for membership in a federally recognized Indian tribe" and the box "indicating that one or more of her parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe" and identifying those relatives].)

Here, Mother claimed nothing other than that she might have Indian ancestry.  A claim of Indian ancestry "is insufficient by itself to provide a reason to believe that either the children or their parents are members of, or eligible for membership in, an Indian tribe" and to require DCFS to make further inquiry.  (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 889.)  "Information about a tribal connection that 'is too vague, attenuated and speculative'

will not support a 'reason to believe the children might be Indian children.' " (*Id*. at p. 888.)

We conclude DCFS did not have a reason to believe Ivy was an Indian child, based on the information Mother provided, and DCFS had no duty to inquire further.

## DISPOSITION

The disposition order is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

SINANIAN, J.*

---

* Judge of the Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.